1

2

3

4                                                            O

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  JHP PHARMACEUTICALS, LLC,a        )  Case No. CV 13-07460 DDP (JEMx)
    Delaware limited liability        )
12  company,                          )  **ORDER GRANTING IN PART AND**
                                       )  **DENYING IN PART DEFENDANTS'**
13                    Plaintiff,       )  **MOTIONS TO DISMISS**
                                       )
14       v.                            )  [Dkts 60 & 61]
                                       )
15  HOSPIRA, INC., a Delaware         )
    corporation; INTERNATIONAL        )
16  MEDICATION SYSTEMS, LTD., a       )
    Delaware corporation; and         )
17  AMERICAN REGENT, INC., a New      )
    York corporation,                 )
18                                     )
                      Defendants.      )
19  _____    )

20

21       Presently before the court are two motions to dismiss the

22  complaint brought by Par Sterile Products, LLC, against the

23  Defendants American Regent, Inc., Hospira, Inc., and International

24  Medical Systems, Ltd.  The complaint alleges false or misleading

25  advertising and labeling, based on the Lanham Act and equivalent

26  state statutes.  The Defendants' motions essentially argue that

27  this Court, in deciding the case, would intrude on matters Congress

28  has left exclusively to the discretion of the FDA.  The Plaintiff,

on the other hand, argues that its complaint does not rest on matters requiring the expertise and authority of the FDA to resolve, and dismissal is not appropriate.

For reasons discussed below, the Court grants the motions in part and denies them in part.

**I. BACKGROUND**

*A. Factual Background*[1]

Par Sterile Products, LLC ("Par") is a manufacturer of injectable epinephrine under the brand name ADRENALIN.  Defendants American Regent, Inc. ("American Regent"), Hospira, Inc. ("Hospira"), and International Medical Systems, Ltd. ("IMS") (collectively, "Defendants") are manufacturers of other injectable epinephrine products.

In 2012, Par (then known as JHP Pharmaceuticals, LLC) submitted a New Drug Application ("NDA") for its 1 mL and 30 mL injectable epinephrine products to the U.S. Food and Drug Administration ("FDA") under the brand name ADRENALIN. (Compl. ¶¶ 3-4.)  On December 7, 2012, the FDA, pursuant to its power under the Food, Drug, and Cosmetic Act ("FDCA"), granted JHP approval to market and sell the 1 mL version of ADRENALIN. (Id. ¶¶ 5-6.)[2]  Par

_____

[1]Both Par and Defendants Hospira and IMS have submitted to the Court additional material in support of their positions. "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).  Therefore, the Court declines to consider, in ruling on these motions, either the Declaration of Harold Storey, submitted by Par, or the Declaration of Jeffrey LeVee, submitted by Hospira and IMS.  This section draws exclusively from the complaint for the facts alleged.

[2]The NDA for the 30 mL ADRENALIN product was still pending at the time JHP filed its complaint. (Compl. ¶ 4.)

2

alleges that it invested millions of dollars in complying with the FDA approval process. (Id. ¶¶ 50-51.)

Par alleges that the Defendants all sell injectable epinephrine products which are not FDA-approved (Compl. ¶¶ 55, 57), an allegation which no Defendant denies.  Par also alleges that the Defendants mislead the public in four different ways.

First, Par alleges that the Defendants represent to consumers, either overtly or through misdirection, that their products are FDA-approved, when they are not.  (Compl. ¶ 71.)

Second, Par alleges that the Defendants misleadingly advertise their products as "safe" and "effective."[3]

Third, Par alleges that the Defendants advertise products that are "illegal" to sell or market under the FDCA (Id. ¶¶ 56-57), while representing to wholesalers and the public that they abide by the law.  Par thus alleges that the Defendants are misleading wholesalers and the public as to the legality of their products.

Fourth, Par alleges that the Defendants omit from their product labeling certain injection location and adverse reaction information that Par's product *must* carry as part of its FDA-approved labeling.  This, Par contends, misleads the public into thinking that Par's product is *more* dangerous than the generics, because it can only be administered in certain locations and can cause certain adverse reactions.

---

[3]Throughout the complaint, Par's constant refrain is that the Defendants market their products as "safe, effective, and FDA-approved."  (Compl. ¶ 71.)  However, for reasons that will be explained below, the Court finds it appropriate to separate the safety/effectiveness issues from the question of FDA approval.

1  Par asserts a claim against the Defendants for each of these
2  representations under the Lanham Act, 15 U.S.C. § 1125(a)(1), which
3  forbids false or misleading advertising.[4]  Par also alleges actual
4  injury, in the form of both competitive disadvantage and harm to
5  reputation and goodwill.

6  Defendants counter that Par's Lanham Act claims should be
7  dismissed, either because they are precluded altogether by the
8  FDCA, because Par has failed to exhaust its administrative
9  remedies, or because the FDA has primary jurisdiction over the
10  claims and the case should be referred to the agency for a ruling.
11  (Def. American Regent's Mot. Dismiss, § II; Defs. Hospira and IMS's
12  Reply, § I; Def. American Regent's Reply, "Argument.")  Defendants
13  Hospira and IMS also raise the issue of the factual sufficiency of
14  Par's claims.  (Defs. Hospira and IMS's Mot. Dismiss, § I.C.2.)

15  *B. Procedural Background*

16  The initial complaint in this matter was filed on October 8,
17  2013, and the Defendants filed motions to dismiss on November 27,
18  2013.  On February 3, 2014, Judge Michael Fitzgerald held a hearing
19  on the motions.  Ultimately, however, the Court ordered the motions
20  denied without prejudice and the case stayed, pending the
21  resolution of another Lanham Act/FDCA case in the Supreme Court,
22  POM Wonderful LLC v. Coca-Cola Co., 134 S.Ct. 2228 (2014).

23

24  [4]Par also alleges violations of the California Business and
25  Professions Code, §§ 17200 and 17500, which similarly prohibit
   misleading advertising.  These state law claims, however, are not
26  substantively addressed in the motions currently under
   consideration, however, as all Defendants agree that the state
27  claims are "substantially congruent" to the Lanham Act claims.
   (Def. American Regent's Mot. Dismiss, § III.A.; Defs. Hospira and
28  IMS's Mot. Dismiss, § II.)  Par similarly focuses its arguments in
   opposition on the Lanham Act claims.

4

1    POM Wonderful was decided June 12, 2014.  On June 19, 2014,

2    the Plaintiff in this case filed notice of the decision, and on

3    July 23, 2014, the Defendants filed new motions to dismiss, which

4    are the subject of this order.

5    **II. LEGAL STANDARD**

6    A complaint may be dismissed under Rule 12(b)(6) only if it

7    "either (1) lacks a cognizable legal theory or (2) fails to allege

8    sufficient facts to support a cognizable legal theory."  Somers v.

9    Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  "All allegations

10   of material fact in the complaint are taken as true and construed

11   in the light most favorable to the plaintiff."  Williams v. Gerber

12   Products Co., 552 F.3d 934, 937 (9th Cir. 2008).  "When there are

13   well-pleaded factual allegations, a court should assume their

14   veracity and then determine whether they plausibly give rise to an

15   entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 679

16   (2009).

17   **III. DISCUSSION**

18   *A. Failure to Exhaust Administrative Remedies*

19   American Regent, alone among the Defendants, raises the issue

20   of failure to exhaust administrative remedies.  It notes that under

21   21 C.F.R. § 10.45(b), citizens are required to submit a Citizen's

22   Petition to the FDA "before any legal action is filed in a court

23   complaining of the [agency's] action or failure to act."  Were

24   Par's claim that the FDA had acted unlawfully, or that the FDA had

25   failed to act where it was required to do so, exhaustion would come

26   into play.  Par makes no such claim, nor indeed any claim against

27   the FDA.  Exhaustion of administrative remedies is not required, or

28   even possible, here.

5

*B. The Lanham Act, the FDCA, and the Scope of the* POM Wonderful
*Holding*

Because this action was stayed pending the outcome of the <u>POM</u>
<u>Wonderful</u> case in the Supreme Court, this Court begins its analysis
with the question of how, if at all, that decision has changed the
law of preclusion with regard to Lanham Act cases and the FDCA.

The Lanham Act broadly regulates representations made in the
course of commerce.  It creates a cause of action against any
person who "uses in commerce any . . . false or misleading
description of fact, or false or misleading representation of fact,
which . . . misrepresents the nature, characteristics [or]
qualities . . . of his or her or another person's goods, services,
or commercial activities."  15 U.S.C. § 1125(a)(1).  The purpose of
the Act is "to protect persons engaged in such commerce against
unfair competition" and "to prevent fraud and deception." 15 U.S.C.
§ 1127.

The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-
399f, on the other hand, is intended "primarily to protect the
health and safety of the public at large."  <u>POM Wonderful</u>, 134 S.
Ct. at 2234.  Although the FDCA, too, regulates the labeling and
advertising of drugs, <u>see</u> 21 U.S.C. § 352, enforcement is not
through a private cause of action, but almost exclusively through
the actions of the FDA.  Apart from a few situations in which
states may initiate enforcement actions, "all such proceedings for
the enforcement, or to restrain violations, of this chapter shall
be by and in the name of the United States."  21 U.S.C. § 337.

The Lanham Act and the FDCA are thus two discrete statutory
schemes that can regulate the advertising, marketing, and labeling

of food and drugs.  Neither, however, precludes the other.  In POM Wonderful, the Supreme Court held that "the FDCA and the Lanham Act complement each other" and that "Congress did not intend the FDCA to preclude Lanham Act suits . . . ."  134 S. Ct. at 2241.  The Court noted that while "[e]nforcement of the FDCA and the detailed prescriptions of its implementing regulations is largely committed to the FDA," that agency "does not have the same perspective or expertise in assessing market dynamics that day-to-day competitors possess."  Id. at 2238.  Thus, the two statutes serve different functions and draw on different areas of expertise.

On the other hand, while articulating a broad vision of the statutes as compatible and complementary, the Court did, in passing, preserve the possibility that *some* Lanham Act suits might be precluded by the FDCA:

> *Unlike* other types of labels regulated by the FDA, *such as*
> *drug labels*, it would appear the FDA *does not preapprove* food
> and beverage labels under its regulations and instead relies
> on enforcement actions, warning letters, and other measures.

Id. at 2239 (citation omitted) (emphases added).

This passage suggests that, at a minimum, the Court might find a Lanham Act claim precluded by the FDCA where it turns on the content of a drug label, especially if that drug label were pre-approved by the FDA.

The Court further suggested, referencing Geier v. American Honda Motor Co., 529 U.S. 861 (2000), that a Lanham action might be barred where "the agency enacted a regulation deliberately allowing manufacturers to choose between different options," or where the Plaintiff's grounds for the Lanham Act claim otherwise conflict

1   with an affirmative policy judgment by the FDA.  POM Wonderful, 134
2   S. Ct. at 2241.

3       There also exists a considerable body of circuit law, pre-POM
4   Wonderful, counseling restraint by courts in approaching Lanham
5   suits with regard to food and drug labeling and advertising.  For
6   example, the Ninth Circuit held, in PhotoMedex, Inc. v. Irwin, 601
7   F.3d 919 (9th Cir. 2010), that "a private action brought under the
8   Lanham Act may not be pursued when, as here, the claim would
9   require litigation of the alleged underlying FDCA violation in a
10  circumstance where the FDA has not itself concluded that there was
11  such a violation."

12      PhotoMedex was the primary case relied on by the lower courts
13  in POM Wonderful, and although it was not specifically overruled,
14  its precedential value may be limited.  But even PhotoMedex
15  recognized that the FDCA did not fully bar Lanham Act claims, where
16  the law was clear and did not require the FDA's expertise or
17  rulemaking authority to determine:

18      If, for example, it was clear that an affirmative statement of
19      approval by the FDA was required before a given product could
20      be marketed and that no such FDA approval had been granted, *a*
21      *Lanham Act claim could be pursued for injuries suffered by a*
22      *competitor as a result of a false assertion that approval had*
23      *been granted*.

24  PhotoMedex, 601 F.3d at 924-25 (emphasis added).  And other
25  circuits have similarly concluded that where the issue of FDA
26  approval is straightforward, a Lanham action is viable.  See
27  Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 939 (8th Cir.
28  2005) (surveying the precedent of multiple circuits and concluding

that Lanham Act claims "concerning representations of FDA approval" are viable *unless* they would require a "preemptive determination" of an issue within the FDA's exclusive authority).

Thus, although the extent of the shift in doctrine after *POM Wonderful* is not entirely clear, both the Supreme Court in that case and the Circuits in prior case law make clear two things. First, Lanham Act claims (even with regard to FDA approval) are not, as a general matter, precluded or barred by the FDCA. But second, *some* claims *may* require the expertise of the FDA to resolve.

Given the strong holding in favor of Lanham claims in *POM Wonderful*, all Defendants understandably seek to limit the reach of that decision, arguing that the case and its holding were about food labels *only* and did not reach the labeling, marketing, or advertising of drugs. The broad language of the opinion, however, does not support that view.

It is true that the Court makes frequent mention of "food and drink" or "food and beverage" in the course of its opinion, *e.g.*, *POM Wonderful*, 134 S. Ct. at 2334 ("The FDCA prohibits the misbranding of food and drink."); *id.* at 2237 ("[F]ood and beverage labels regulated by the FDCA are not, under the terms of either statute, off limits to Lanham Act claims."); *id.* at 2238 ("Although both statutes touch on food and beverage labeling . . . ."); etc. And, as noted above, the Court suggests a difference between food labeling, which is not subject to FDA pre-approval, and drug labeling, which is. *Id.* at 2239.

But the arguments, logic, and holding of *POM Wonderful* are couched in much broader language and strongly suggest a more wide-

1  ranging application.  For example, the Court's argument that the

2  Lanham Act draws on the market expertise of competitors, id. at

3  2238, does not depend on anything peculiar to food and beverage

4  labeling.  Nor does its argument that "neither the Lanham Act nor

5  the FDCA, in express terms, forbids or limits Lanham Act claims

6  challenging labels that are regulated by the FDCA," id. at 2237;

7  nor does its point that "the Lanham Act and the FDCA have coexisted

8  since the passage of the Lanham Act in 1946" and Congress has never

9  sought to address preclusion by one or the other.  Id.

10      The logical building blocks of the Court's specific holding

11  with regard to food and beverage labeling would seem to be equally

12  applicable to food and beverage advertising, drug marketing,

13  medical device labeling, cosmetics branding, or any other kind of

14  marking or representation which would fall under both the Lanham

15  Act and the FDCA, *unless* preclusion is required for some specific

16  reason.[5]  The general presumption following POM Wonderful, then, is

17  that Lanham Act claims with regard to FDCA-regulated products are

18  permissible and, indeed, desirable.  Id. at 2231 ("Allowing Lanham

19  Act suits takes advantage of synergies among multiple methods of

20  regulation.").

21  *C. Par's Lanham Act Claims*

22      Having established POM Wonderful's general presumption in

23  favor of Lanham Act claims and against preclusion, the Court now

24  turns to each of Par's bases for its claims.

25  _____

26      [5]As noted above, the Supreme Court suggested two such reasons
    in POM Wonderful: the FDA may have pre-approved a particular
27  labeling scheme, as in the labeling of FDA-approved drugs; or the
    agency may have authorized a menu of possible lawful choices for
28  manufacturers, as was the case in Geier.  (The common element, of
    course, is positive regulatory action in the matter by the FDA.)

1  1. FDA Approval

2       Par's fundamental argument with regard to FDA approval is that
3  it is a sort of "Good Housekeeping Seal" for pharmaceuticals: it is
4  the government's imprimatur on a product, indicating quality,
5  safety, and desirability.  Although some drugs may be lawfully sold
6  without FDA approval, Part III.C.3 *infra*, if a product *has* been
7  approved, consumers may take some assurance that it has been
8  properly tested and meets the agency's minimum quality standards.
9  This makes an FDA-approved product a more attractive product,
10 whether at the wholesale, retail, or end user level.  But it can
11 also be expensive to get approval for a drug, so a company that
12 chooses to invest in getting approval may operate at a competitive
13 disadvantage if other companies can falsely represent to the public
14 that their unapproved products are FDA-approved.  Thus,
15 representations that a drug is approved when it is not undermine
16 the Lanham Act's public policy goals both by confusing consumers
17 and by enabling unfair competition by producers who have not
18 bothered to get FDA approval.

19      Par alleges that Defendants have misrepresented their products
20 as being FDA-approved in several ways.  First, Par alleges that
21 Hospira advertises its product "as an NDA product . . . when, in
22 fact, Hospira has not obtained FDA approval of such an NDA."
23 (Compl. ¶ 70.)  Second, Par alleges that Hospira, at least,
24 advertises that Par's ADRENALIN is the "brand name equivalent" of
25 its own product, and that it is a "generic" version of Par's
26 product.[6]  In a more general way Par alleges that Defendants

27 _____

28      [6]Par introduced these specific allegations against Hospira
                                              (continued...)

                                    11

encourage purchasers to think of their products as "comparable to or interchangeable with" Par's product. (Id. at ¶ 101.) Par contends that consumers will believe that Defendants' unapproved products are interchangeable with Par's approved one. Finally, Par alleges that Defendants advertise via certain industry lists, and that consumers expect the products on such lists to be "branded drugs or generic products," although Defendants' products are not "generics" as defined by the FDA. (Id. at ¶ 70.)

Defendants argue that claims based on such factual allegations are precluded, even post-POM Wonderful. Defendant American Regent cites to a recent case in the District of Utah, where the court found precluded a company's Lanham claim that a competitor was "falsely advertising that the current [medical device] model has FDA approval." Catheter Connections, Inc. v. Ivera Med. Corp., No. 2:14-CV-70-TC, 2014 WL 3536573, *1, *6 (D. Utah July 17, 2014). But that case dealt with re-approval of new models of existing medical devices, a circumstance under which the FDA leaves it to the manufacturer, in the first instance, to determine whether it must apply for approval again or assume that the approval carries over. Id. at *5. Thus, the manufacturer there could plausibly claim that its product was, in fact, approved, at least until the FDA determined otherwise–a determination that would, of course, be entirely within the agency's purview. That is obviously very

---

[6](...continued)
only at oral argument. Ordinarily, the Court would be reluctant to consider such late allegations as part of the complaint. However, because they sharpened the debate during oral argument, were adequately argued by Defendants, and were consistent with the other, more general allegations in the Complaint, the Court includes them in this discussion.

1    different from the present case, where the Defendants have never

2    had (and do not claim to have had) their products approved in the

3    first place.

4         In short, Par's claim is not precluded.

5         Defendants also argue that Par's claim falls under the

6    "primary jurisdiction" of the FDA.  Under the primary jurisdiction

7    doctrine, a court, though having jurisdiction to hear the

8    complaint, may in some situations be required to "refer" the matter

9    to an administrative agency for resolution of a particular

10   technical issue.  See Reiter v. Cooper, 507 U.S. 258, 268 (1993)

11   ("[C]laims properly cognizable in court [may] contain some issue

12   within the special competence of an administrative agency.").  The

13   doctrine applies where there is "(1) the need to resolve an issue

14   that (2) has been placed by Congress within the jurisdiction of an

15   administrative body having regulatory authority (3) pursuant to a

16   statute that subjects an industry or activity to a comprehensive

17   regulatory scheme that (4) requires expertise or uniformity in

18   administration." United States v. Gen. Dynamics Corp., 828 F.2d

19   1356, 1362 (9th Cir. 1987).

20        There is no need to invoke primary jurisdiction doctrine as to

21   this claim.  In this instance, it takes no special expertise to

22   determine whether the FDA has granted approval or not; nor are

23   there "uniformity of administration" concerns in the court making

24   that simple factual determination.  The FDA itself maintains a

25   comprehensive list of approved drugs, see FDA, "Drugs@FDA,"

26   FDA.gov,

27   http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm

28   (last visited Aug. 28, 2014), and while there may be cases where

1   approval is a gray area, no Defendant has argued that this is one.

2   Indeed, the fact that the Defendants' drugs are unapproved is not

3   contested by any party.

4       The same thing is true of the term "generic."  To be declared

5   a "generic" drug by the FDA, a product must go through an approval

6   process prescribed by the agency.  See "Generic Drugs: Questions

7   and Answers," FDA.gov (Sept. 3, 2013),

8   http://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers

9   /ucm100100.htm.  But the FDA maintains lists of approved generics,

10  just as it does for brand-name products.  Id.  If all that Par

11  alleges is that Defendants are advertising their products as

12  approved generics when they are not in fact approved, the Court

13  need not refer the question to the FDA's expertise to make factual

14  determinations.

15      Primary jurisdiction is not a bar to Plaintiff's claims here.

16      Defendants also allege that Par's complaint is factually

17  insufficient to support its Lanham claim.  Defendants argue that

18  Par has not alleged specific statements by the Defendants

19  representing that their products are FDA-approved.  Defendants then

20  cite primarily to Mylan Labs., Inc. v. Matkari, 7 F.3d 1130 (4th

21  Cir. 1993) for the proposition that a plaintiff cannot show that

22  the defendant implied FDA approval solely by introducing evidence

23  that the defendant put the product on the market.

24      With regard to Defendant Hospira, Par has, in fact, alleged a

25  specific representation: Par alleges that Hospira advertises its

26  product as "an NDA product." (Compl. ¶ 70.)  While that is not

27  precisely the same as saying that the product is "FDA-approved," it

28  could easily be construed that way by the public, who should not

14

bear the burden of uncovering information that contradicts the
impression given by misleading advertising.  See, e.g., Williams v.
Gerber Products Co., 552 F.3d 934, 939-40 (9th Cir. 2008) (holding
that the misleading labeling of a largely juice-free candy as
"fruit juice snacks" was not saved from a false advertising claim
by an FDA-approved ingredient list on the side of the box).
Therefore Par has made a plausible allegation that Hospira has made
misleading statements about its products' FDA approval status.

    With regard to the other two defendants, however, it is not so
clear.  Mylan, though not binding on this Court, makes a compelling
point: merely putting the product on the market is probably not a
representation that the product is FDA-approved.  At the other end
of the factual spectrum, the Ninth Circuit has said that an actual
"false assertion" that the product was approved could sustain a
Lanham Act claim where "it was clear that . . . no such FDA
approval had been granted."  PhotoMedex, 601 F.3d at 924-25.

    Par's complaint falls somewhere between those two clear poles.
With regard to American Regent and IMS, at least, Par alleges no
overt "false assertion."  On the other hand, Par's argument is more
subtle than that of the plaintiff in Mylan.  Par does not merely
allege that putting the product on the market creates a misleading
impression that the drug is FDA-approved.  Rather, it alleges that
the Defendants put their products on industry "Price Lists," and
that "buyers believe that all prescribed drugs identified on the
Price Lists are . . . FDA-approved."  (Compl. ¶ 71.)  And it
alleges that by listing their drugs as "generics," they are
implying that their products are "equivalents" of Par's FDA-

approved product, which might mislead consumers into thinking that Defendants' products are also FDA-approved.  (_Id._ at 70.)

The problem, for Par, is that when the alleged representation is not an overt false statement, but merely misleading in context, the evidentiary showing required to sustain a Lanham claim is higher.  In such a case, "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." _William H. Morris Co. v. Grp. W, Inc._, 66 F.3d 255, 258 (9th Cir. 1995).  Thus, to succeed on its claims against American Regent and IMS, Par must allege facts tending to show that the message "our product is FDA-approved" was actually conveyed to consumers by American Regent and IMS.

Here, Par does allege that consumers suffer actual confusion: "[B]uyers believe that all prescribed drugs identified on the price lists are . . . FDA-approved." (Compl. ¶ 71.) While Par has not yet produced actual evidence of these consumer beliefs, at the motion to dismiss stage, the Court can accept allegations of such facts as sufficient.

Par's Lanham Act claims that its competitors are falsely representing their products as having been FDA-approved are neither precluded by the FDCA nor within the primary jurisdiction of the FDA.  Plaintiff's factual pleadings are sufficient to survive a motion to dismiss.  As to the question of whether Defendants advertise their products as FDA-approved, the motion to dismiss is denied.

2. "Safe" and "Effective"

16

In its complaint, Par frequently alleges that the Defendants misleadingly represent their products as "safe, effective, and FDA-approved." (E.g., Compl. ¶ 72.)  A determination of whether the Defendants' products are "safe" or "effective" might well fall within the primary jurisdiction of the FDA, or even be precluded entirely.  However, the Court need not decide these issues today. Par alleges *no* facts to show that Defendants' products are either unsafe or ineffective.  The repeated inclusion of such language may well be mere rhetorical excess on Par's part.  However, to the extent that any of the Plaintiff's arguments about FDA approval rest on a determination of either safety or effectiveness, such arguments suffer a fatal lack of factual sufficiency.  Thus, the sole question with respect to the surviving claim against Defendants is whether it overtly represents its products as being "FDA-approved," and *not* any question of safety or effectiveness.

3. Legality of the Defendants' Products

Par further alleges that the Defendants are falsely representing to consumers that their products "comply with all applicable laws, including the FDCA."[7]  (Compl. ¶¶ 60, 87.)  And at least respecting Defendants Hospira and IMS, the complaint alleges sufficient facts to support a finding of overt statements to this effect.  For example, Hospira is alleged to claim on its website

---

[7]In its Opposition, Par seems to suggest that no finding of illegality is needed: "Par's complaint is not based on a violation of the FDCA; it is based on Defendants' deceptive advertising of their products as equivalent to Par's." (Opp'n § I.B.)  However, because the complaint raises allegations that the Defendants are misleading consumers by claiming to comply with the law, the Court, to resolve that claim, would have to make a factual finding with regard to the alleged FDCA violations.

1   that its complies with "applicable laws and other requirements."

2   (Compl. ¶ 62.)

3   　　　However, unlike a mere determination that a drug is or is

4   not FDA-approved, the allegation that the drugs are being sold

5   *unlawfully* is an issue that would require a more complex finding

6   from the agency.  Of course, if there were a clear and absolute

7   rule making it patently unlawful to market *any* drug without going

8   through the FDA approval process, it might not be necessary for the

9   FDA to make a specific finding regarding the Defendants' products

10  for the court to be able to determine that Defendants' products do

11  not comply with the FDCA.  <u>PhotoMedex</u>, 601 F.3d at 924-25.

12  　　And at first blush, 21 U.S.C. § 355(a) would seem to provide

13  such a clear rule: "No person shall introduce or deliver for

14  introduction into interstate commerce any new drug, unless an

15  approval of an application filed pursuant to subsection (b) or (j)

16  of this section is effective with respect to such drug."  As even

17  Par admits (Opp'n, "Factual Background"), however, there are some

18  exceptions to this seemingly clear rule.  Specifically, not all

19  drugs marketed are "new," and many older drugs, even when updated,

20  are exempt from the strictures of  § 355(a).  <u>See</u> 21 U.S.C. §

21  321(p) (setting out grandfathered exceptions to the definition of

22  "new drug"); <u>see also</u> FDA, <u>Compliance Policy Guide Sec. 440.100</u>

23  <u>Marketed New Drugs Without Approved NDAs and ANDAs</u>, FDA.gov (Sep.

24  16 2011), <u>available at</u>

25  http://http://www.fda.gov/iceci/compliancemanuals/compliancepolicyg

26  uidancemanual/ucm074382.htm (discussing grandfather clauses in the

27  FDCA and a "Prescription Drug Wrap-Up" program that brought many,

28  but not all, old drugs into the fold of FDA approval).

In short, unlike the binary factual determination of whether Defendants' products are, in fact, FDA-approved, the question of legality directly implicates the FDA's rulemaking authority.  The determination of whether a drug is "new," and whether it can be lawfully marketed under the FDCA, involves complex issues of history, public safety, and administrative priorities that Congress has delegated exclusively to the FDA.

That does not mean, however, that an allegation of illegality under the FDCA could *never* form the basis of a successful Lanham Act claim.  As <u>PhotoMedex</u> and <u>POM Wonderful</u> both make abundantly clear, where the court is not called upon to make determinations within the exclusive purview of FDA authority, a Lanham Act claim may be heard, even if the subject of the claim touches the area of authority of the FDCA.  Thus, this claim is not precluded as a categorical matter. If the Plaintiff were to pursue the matter with the FDA through its administrative procedures and obtain a clear statement from the agency that the Defendants are selling their products illegally or otherwise breaking the law, *and* if the Defendants at that point chose to affirmatively declare in their advertising that their products comply with the law, a federal court could hear a Lanham Act claim for false advertising.

But this Court cannot proceed on this claim without a clear statement by the FDA.  To do so would be to arrogate the authority of the FDA to decide, at least in the first instance, the legality or illegality of marketing a particular substance.  "It is clear to us that FDA has power to determine whether particular drugs require an approved NDA in order to be sold to the public. FDA is indeed the administrative agency selected by Congress to administer the

1  Act, and [it] cannot administer the Act intelligently and

2  rationally unless it has authority to determine what drugs are 'new

3  drugs' . . . and whether they are [grandfathered]." <u>Weinberger v.</u>

4  <u>Hynson, Westcott & Dunning, Inc.</u>, 412 U.S. 609, 624 (1973).

5      In short, in order to resolve Par's Lanham Act claim based a

6  factual allegation that the Defendants are falsely claiming to

7  comply with the law while in fact selling illegal products, the

8  Court must resolve an issue that Congress has placed "within the

9  jurisdiction of an administrative body having regulatory

10  authority," under a comprehensive regulatory scheme. <u>Gen. Dynamics</u>

11  <u>Corp.</u>, 828 F.2d at 1362.  And, crucially, this is not a question

12  that can be resolved without expertise.  <u>Id.</u>  Moreover, Congress's

13  decision to centralize authority to determine the legality of drug

14  sales in the FDA was obviously intended to provide "uniformity of

15  administration."  <u>Id.</u>  Thus, it seems clear that Par's Lanham Act

16  claim with regard to legality requires a determination that is

17  within the primary jurisdiction of the FDA.

18  <u>4. Misleading Labeling</u>

19      Finally, Par argues that the Defendants mislead the public by

20  not including, in their packaging and labeling, all of the caveats

21  and warnings that Par's product must carry under the terms of its

22  FDA approval.  This, it is alleged, creates the impression that

23  Par's product is *less* safe, because it comes with *more* warnings

24  than the Defendants' unapproved products.

25      Even if this allegation is true, Par faces several hurdles to

26  basing a Lanham Act claim on it.  First, because the deceit alleged

27  is by implication rather than an overt false statement (such as

28  "Par's ADRENALIN is less safe than our product!"), Par has the

burden of pleading at least some facts tending to show that the
alleged implied message is actually transmitted to the consumer.
William H. Morris, 66 F.3d at 258.  Here the pleading is thin at
best.  Par does not allege facts tending to show that the negative
message about its product is actually conveyed to consumers.
Indeed, the message is at least ambiguous: a savvy consumer of
pharmaceuticals, used to many pages of dire warnings, might well be
put *on guard* by the lack of similar warnings on the Defendants'
products.

Even if Par's pleading were sufficient to show that the
alleged implied message is actually transmitted to consumers,
however, the area of drug labeling was specifically singled out by
the POM Wonderful Court as being one where the FDA takes a
particularly active role.  POM Wonderful suggested, at least
obliquely, that drug labeling might be an area where Lanham Act
claims *are* precluded.

Par argues that because the Defendants' products are
unapproved, they are effectively unregulated by the FDA.  (Opp'n §
I.C.)  There is, perhaps, some merit to this argument.  Unlike the
situation envisioned in POM Wonderful, where the FDA would have
*pre-approved* a drug label, here Par correctly points out that the
FDA has taken no action at all with regard to these labels.  Thus,
this case might not fall within POM Wonderful's caveat-in-dictum.

However, the Court need not resolve this thorny issue, because
there is a third, truly fatal problem with Par's allegation:
namely, it requires the Court to determine, as a matter of fact,
that Par's ADRENALIN is *not* less safe than the Defendants' various
products.  After all, if ADRENALIN *were* less safe, the implied

21

1   message would not be false or misleading; it would be correct.  Par

2   may find it obvious that its product is not less safe than the

3   Defendants' products, but it has not alleged any particular facts

4   tending to prove the comparative safety of the various products

5   involved.[8]

6       Because the Plaintiff's Lanham Act claim based on false or

7   misleading labeling requires a showing of facts not properly

8   pleaded, this claim is dismissed as to all Defendants.

9   **IV.  CONCLUSION**

10      For all the reasons discussed above, Plaintiff's Lanham Act

11  claim and corresponding state law claims based on false

12  representations of FDA approval survive, and the Defendants'

13  motions are denied.

14      Plaintiff's claims based on false or misleading

15  representations that the Defendants's products comply with the law

16  are dismissed without prejudice, so that the Plaintiff can, if it

17  wishes, file a petition with the FDA to have its competitors'

18  products declared unlawful.

19      Finally, any claims based on representations that the

20  Defendants' products are "safe" and/or "effective" are dismissed.

21  Claims that the Defendants' labels and packaging are misleading

22

23  ///

24  ///

25

26  _____

27      [8]Even if Par had alleged such facts, however, the safety
    determination would almost certainly require the scientific
28  expertise of the FDA, and so would likely fall within the agency's
    primary jurisdiction.

1    because they imply that their products are safer than Plaintiff's

2    are also dismissed.

3         The motions to dismiss are thus granted in part and denied in

4    part.

5

6    IT IS SO ORDERED.

7

Dated: October 7, 2014

8                                              DEAN D. PREGERSON
                                               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28